# The Chicago, Burlington and Quincy Railroad Company

## *v.*

## Otway Watson *et al.*[*]

*Filed at Ottawa February 7, 1885.*

1. Assignee in bankruptcy—*whether he may take after debtor's right of redemption is gone.* After land of a debtor has been legally sold on a valid execution against him, and the time of redemption has expired without any redemption having been made, the debtor's title and interest are cut off, and his assignee in bankruptcy will acquire no right to the land.

2. Mortgage—*whether a transaction was a mortgage.* A bank, to protect itself, purchased land of its debtor under a judgment in its favor, and also under a trust deed, which was a first lien, under which sales a deed was made, and at the request of the debtor the land was conveyed to another for a sum equal to the amount of the several bids, or what it cost, and also the balance due to the bank from the debtor, taking notes secured by trust deed from such grantee, but still retained the unsettled demands on the debtor as collateral security for the payment of the notes given by the purchaser of the land, and agreed when such notes were paid to satisfy all the unsettled demands against the debtor, thereby obtaining the additional security of the purchaser's liability to pay. The bank afterward foreclosed the trust deed, and received a deed. It was *held,* that the transaction did not constitute a mortgage, and that an assignee in bankruptcy of the original debtor, appointed upon an adjudication in bankruptcy after the foreclosure of the trust deed, had no right to redeem from such sale, and treat the transaction as a mortgage.

3. A debtor of a bank conveyed his interest in a tract of land to an officer of the bank, under an agreement that the debtor should aid in perfecting the title thereto in obtaining sales of the same under prior liens and procuring satisfaction of incumbrances, the bank to pay the parties holding such liens and incumbrances, and to allow a credit for the net value of such land over and above the costs and expenses incurred in perfecting the title, upon certain notes given it by a third person, which notes, when paid, the bank had agreed should satisfy a large amount of the debtor's unsettled liabilities to it, whereby the debtor was to receive the benefit from the satisfaction of his debts to the bank, but in no event was to have any right to redeem the property from the bank. It was *held,* that the conveyance and agreement did not constitute the transaction a mortgage by the debtor, and that such arrangement was not fraudulent as to other creditors of the debtor.

---

[*]The case of *Commercial National Bank of Chicago* v. *Watson et al.* was heard and considered with this case.

4. Decree—*of its binding effect, even if erroneous.* A decree on a bill filed by a judgment creditor against his debtor and other judgment creditors, on whom service was had, found certain real estate to be the property of the debtor and subject to the lien of the complainant's judgment, and directed its sale, and the application of the proceeds to the payment of such judgment, and adjudged it to be a prior and first lien upon the property as against the owners of the older judgments. Under this decree the property was sold upon execution, and no redemption being had, the property was conveyed to the assignee of the certificate of purchase: *Held,* that in the absence of proof of fraud, such decree, even though erroneous, was conclusive upon the parties thereto, and that the title acquired under the same could not be made subordinate to the liens of the prior judgments.

5. Debtor and creditor—*giving preference—whether a transaction to that end is fraudulent.* Proceedings taken by one creditor whereby to acquire title to land of his debtor, freed from the liens of junior judgment creditors, even if under the advice and assistance of the debtor, and under his agreement to procure the assignment of a judgment which is a prior lien, where the money or means of the debtor is not used to procure the assignment, are not fraudulent as to other judgment creditors of the same debtor. In such case the unperformed agreement on the part of the debtor to procure the assignment of such judgment, would not incapacitate the creditor from obtaining the same with his own means.

6. A debtor's land had been sold under execution, and also under a deed of trust, and title thereto acquired by a bank, which held other indebtedness against him. It was arranged between the parties that the land should be sold and conveyed by the bank to a third person, for a sum sufficient to include the sum paid by the bank for the same, together with the amount of such other indebtedness, and it was also agreed that the payment of the notes given by the purchaser should satisfy the other indebtedness to the bank, the evidence of which it still retained as collateral security for the payment of the purchase money. It was *held,* in a suit between creditors, that the debtor had the lawful right to apply any of his property, or interest therein held by him, toward the payment of the notes of the purchaser of the land, whereby to discharge his indebtedness to the bank, and that such application amounted but to a preference of creditors, and was not fraudulent.

7. An insolvent debtor has a lawful right to pay a *bona fide* debt with any property or means he may have, in preference to any other creditors having no liens upon the same, and such payment can not be impeached for fraud. Nor will it be fraudulent for the debtor so paying by the conveyance of land, to procure releases of the same from prior incumbrances by payment through any honest means, so as to make the property conveyed pay as great a part of his indebtedness as possible.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. William H. Barnum, Judge, presiding.

These two causes arise from one decree of the circuit court of Cook county. This decree was brought before the Appellate Court as two causes,—one on the appeal of the Commercial National Bank, and one on error, by the Chicago, Burlington and Quincy Railroad Company. These causes seem to have been considered together in the Appellate Court, where the decree was affirmed. From the judgment of the Appellate Court affirming the decree of the circuit court, the railroad company and the bank appeal, separately, to this court, and their appeals are on the docket of this court as separate causes. They were, however, argued and submitted together in this court, and are disposed of by one opinion and one judgment.

The suit in which this decree was rendered was begun February 16, 1878, by Watson and others, as judgment creditors of Samuel J. Walker. They at that time were the owners of divers judgments against Walker in the courts of Cook county, each of which had, by issue of execution, been made a lien upon the lands of Walker in Cook county. These judgments amounted in the aggregate, besides interest and costs, to about the sum of $71,000, and were entered, the first on April 10, 1874, and from time to time until November 5, 1874, when the last judgment was entered. To this bill Samuel J. Walker, the Commercial National Bank, and the Chicago, Burlington and Quincy Railroad Company, and others, were made parties defendant. The relief sought by complainants related solely to a strip of land in Chicago, designated on the maps as "Private Railroad street," which at that time was in possession of the railroad company under a lease from Eames, and sought to set aside as fraudulent all the proceedings under which the Commercial bank or Eames claimed

any interest in or lien upon that strip of land.   Pending this
suit, Samuel J. Walker was adjudged a bankrupt on April 26,
1878, and soon after this Jenkins became assignee in bank-
ruptcy of S. J. Walker, and the estate of the bankrupt was
assigned to him July 31, 1878, and afterwards, having been
made a party defendant to this bill by supplement, and hav-
ing filed his answer herein, he filed in this cause, on the 31st
day of January, 1880, what is styled a cross-bill.   Mean-
while the railroad company, on January 11, 1879, had bought
from Eames this strip of land, and claimed title thereto and
was in possession thereof.   Jenkins, in his cross-bill, seeks
to set aside as fraudulent all claims to this land of the bank,
and of Eames, and of the railroad company, and claims the
same as freed from the liens of complainants, and in addition
Jenkins seeks to set aside as fraudulent the title of the bank
to about five hundred acres of land lying in Lake county, and
that the same be adjudged a part of the bankrupt's estate in
his hands, for the benefit of creditors of the bankrupt.   The
decree of the circuit court set aside the claims of all defend-
ants in the original bill as to the private railroad street,
and ordered the possession of the same to be turned over to
Jenkins, and subjected the same to sale for the satisfaction
of the judgments of complainants, directing the surplus, if
any, to be paid over to Jenkins, the assignee, and as to the
Lake county land, sustained the title of the bank, and dis-
missed the cross-bill of the assignee, so far as it affected the
Lake county land.

It is shown by the pleadings and proofs in this record, that
for many years before 1873, Samuel J. Walker had been an
extensive, bold and successful operator in real estate, chiefly
in the city of Chicago.   He was in the habit, at times, of
causing the title of parts of his lands or lots to be conveyed
to some friend as a purchaser, and thus procuring the notes
of such apparent purchaser for what purported to be purchase
money, and having procured and placed on record a deed of

trust on the property in question securing such notes, he used the notes and deeds of trust as collaterals in borrowing money to be used in his business. At other times he made notes payable to his own order, and to secure payment thereof he made deeds of trust or mortgages upon parts of his property, and after recording the same he sold such notes in the market, or pledged them as collaterals in making loans. In 1873, before the panic of that year, although known to be largely indebted, and although most of his property was incumbered, he was regarded as a man of immense wealth, and was possessed of an immense amount of real estate. When the panic came, in September, 1873, Walker was indebted and liable to the Commercial National Bank of Chicago in various ways, and was indebted to the National City Bank of Ottawa on paper which was in the custody of the Commercial bank for collection. Henry F. Eames was president of the Commercial National Bank, and as such was charged with the duty of securing and collecting all these demands. This indebtedness in the hands of Eames at that time amounted to from $60,000 to $80,000. Walker at this time was not known to have any unincumbered lands, and his titles of record were complicated in the highest degree. The records of Cook county presented in this regard a maze apparently incapable of any solution which could be relied on as accurate or safe.

Eames having ascertained that the title of record to a valuable tract of land in Lake county was in Walker, and having a judgment note against Walker belonging to his bank, caused a judgment to be entered in the circuit court of Lake county on January 28, 1874, for about $29,735, and sued out an execution, and levied upon this tract of land, and had the same advertised and sold to satisfy this judgment. The sale was made July 6, 1874, and Eames became the purchaser for the bank, and received a certificate of purchase, and no redemption from this sale was ever made. This land was,

however, incumbered by prior liens.   The first was that of a trust deed from Walker, recorded in 1872, securing to one Tilton some $50,000, and interest thereon at the rate of ten per cent, and the second was that of a trust deed made by Walker, and duly recorded a short time before this judgment was entered, purporting to secure a $50,000 note of Walker, payable to his own order.   To protect this purchase of the Lake county land, made at the sheriff's sale of July 6, 1874, Eames bought for the bank the Tilton claim, and caused this Lake county land to be advertised, and sold under the trust deed securing the Tilton claim, and bid off this land at $134,-000.   On account of some defect in the advertisement, this sale was not consummated, and before July, 1875, Eames caused this property to be again advertised for sale under the Tilton deed of trust.   Meanwhile, he had ascertained that the $50,000 note mentioned in this second deed of trust as payable to Walker's own order, had never been sold by Walker, but was merely pledged by him to the First National Bank of Chicago for a debt of Walker of about $7500.   This claim Eames bought for his bank, and at that sale, which occurred about the first of July, 1875, Eames bid off the property for his bank at $86,000, and the same was conveyed to him by the trustee making the sale under the Tilton trust deed.   On July 3, Eames sold and conveyed this land to F. C. Moore-head.   On the same day, Moorehead, for the purchase price, made his four promissory notes, payable to the Commercial National Bank, amounting in the aggregate to about $157,-900, to be paid, one-third in six months, one-third in twelve and one-third in eighteen months, with interest at eight per cent, payable semi-annually, and to secure the payment of these four notes made a deed of trust to Keep conveying this Lake county land.   This deed contained a power, on default of payment of principal or interest, to declare the whole due, and to sell the property to satisfy the notes, and to make an absolute deed to the purchaser.   This deed of trust to Keep

contained a provision that upon payment by Moorehead of one-third of the purchase money, one-third of the land should be released from the lien of this conveyance, and that upon the payment of a second third of the purchase money, another one-third of the land should be released. On January 31, 1877, default having been made by Moorehead in payment of the first two notes, and also in the payment of interest on the whole, due notice having been given, the land was sold under the trust deed of Moorehead to Keep, and was bid off by the Commercial National Bank at $100,000, and Keep, the trustee, conveyed the land by deed to the bank.

In the three years which intervened between the entry of the judgment against Walker on January 28, 1874, in the circuit court of Lake county, and the deed of Keep conveying this Lake county land to the Commercial National Bank, other events were occurring in Cook county which are claimed to have a bearing upon both branches of this controversy. On February 25, 1874, a judgment was rendered in the Superior Court of Cook county for about $5237, against Samuel J. Walker, and in favor of one Rawson. On March 14, 1874, judgment in the same court was entered against Walker, and in favor of one Moffat, for about $7713. On April 8, 1874, judgment in the same court was entered against Walker, and in favor of one Lee. Executions were at once issued upon each of these three judgments, thus rendering each of these three judgments, respectively, a lien on all the real estate interests of Walker in Cook county. Between April 9, 1874, and November 6, 1874, each of the judgments owned by the respective complainants in this suit were entered, either in the circuit or Superior court of Cook county, and by the issue of executions upon them, respectively, each of them, in its turn, became a lien upon Walker's real estate in Cook county.

H. T. Helm, an attorney at law practicing in Chicago, was employed by Eames, before January, 1874, to look after the interests of the Commercial National Bank in the matter of

making collection of the demands against Walker which were controlled by Eames. In his researches in the records of Cook county he found that, years before this, Walker had laid out into town or city property four different additions to Chicago, adjoining each other, and on the map of each such addition was a strip of land designated "Private Railroad street," and so located that the several parts so designated upon each plat, respectively, constituted, when taken together, a strip of about eighty feet in width and about a mile long. The records showed that in many of the deeds which Walker had made to purchasers of lots adjoining this private railroad street, Walker had covenanted that the purchaser and his assignees should have the use of this street for railroad transportation, and the privilege of connecting tracks from such lots with the main tracks laid down, or to be laid down, in this private railroad street, and that on the plats were shown four main parallel railroad tracks; and it was a fact that for most of the way along said strip there were, in 1874, two parallel railroad tracks in use,—used by some railroad company, with the consent of Walker, in transportation to and from lots adjoining or near to this street. Conceiving that Samuel J. Walker, by the records, had a property interest in this strip of land called "Private Railroad street," Helm adopted means with a view of acquiring the same for the bank in satisfaction of some of the demands held by Eames against Walker. To this end a judgment note held by the bank was transferred for collection to John L. Manning, an attorney at law, and on January 20, 1875, judgment in his name, as plaintiff, was entered upon the same in the circuit court of Cook county, for $23,221.19, and costs, against Samuel J. Walker, and execution was at once sued out and levied upon the land designated as "Private Railroad street;" and on January 25, 1875, Helm filed a bill in chancery in the same court, in the name of Manning as complainant, against Samuel J. Walker, Henry H. Walker, Andrew Price, and others, as

defendants, and after setting out this judgment and execution, it was charged in the bill that Walker was insolvent and unable to pay his debts; that in Cook county alone, judgments amounting to over $600,000 had been obtained against him, and on most of these judgments executions had been issued, but after diligent search no property could be found out of which to obtain satisfaction, and that various of these judgment creditors had sought in vain for satisfaction by creditors' bills. The bill further sets out the complicated state of the records as to Walker's titles, and that by great research, made at great expense, complainant had discovered that Walker had some interest in the property heretofore described as "Private Railroad street," and that complainant had caused his execution to be levied thereon. It was also said in the bill that the records of Cook county at that time showed a very great number of deeds, contracts, mortgages, deeds of trust, plats, subdivisions and vacation of plats, etc., all made by Samuel J. Walker,—so voluminous that of themselves they were equal to several volumes of records,—and that in many cases lands in which he had an interest were in fact held in the name of others. And among other things the bill showed that the title to parts of this private railroad street was at that time held in the name of Henry H. Walker, and that before the making of the plats of the several additions through which this strip of land extends, part of it was incumbered (with other lands) by Walker, in 1866, by a mortgage to one Stewart, for $40,000, and part of it (with other land) by a mortgage made in 1857 by Walker, to one Shelby, for $95,000, and part of it (with other land) by a deed of trust, made by Walker in 1867, to secure to one Price about $40,000, and that since September, 1873, this landed interest was incumbered by the various judgments heretofore mentioned, and that complainant, by his vigilance and research, discovered this interest of Walker in this strip of land. The relief sought was a clearing up of Walker's title thereto, and that by reason of

his superior diligence complainant should have priority over all older judgment creditors, and that Walker's interest in this private railroad street should be applied to the payment of complainant's judgment, and that the sheriff should be directed to sell and apply the proceeds to complainant's judgment. And such proceedings were afterwards had, that on January 11, 1876, a decree was entered adjudging, among other things, the lien of that judgment to be a first lien upon this land as against all other judgment creditors of Walker, and the sheriff was, by the decree, ordered to proceed to sell, etc. None of the complainants here, or of any other judgment creditors, were parties thereto.

In the meantime, on January 4, 1876,—about one week before the entry of this decree,—Samuel J. Walker and wife made a quitclaim deed conveying to Eames all their interest in this strip of land known as "Private Railroad street," in which the wife's dower was released, and this deed was filed for record February 16, 1876. On the same day (January 4, 1876,) Eames gave to Walker a writing, stating the fact of the making of that deed, and declaring that it was understood that said property (when the value thereof should be ascertained, by sale or otherwise, as stated below,) should be applied on the notes of F. C. Moorehead; that the title thereto should be perfected as speedily as possible; that to that end Walker should do all things which might be practical and should be deemed necessary for clearing said title, by judicial sale, foreclosure, release, or otherwise, of the liens and incumbrances on the same,—and particularly the Price and Shelby claims should be released or cleared up within one year, the Stewart mortgage (by sale, foreclosure or release,) within six months, and that a certain judgment lien agreed upon (being the Rawson judgment, or the balance of about $5000 due on the same,) should be secured, by transfer or otherwise, within ninety days; and that if said Walker should comply with the above there should be a stay or delay on

the Moorehead paper, but if there should be a failure in the above, no delay was to be guaranteed. The writing further provided that there should be credited on the Moorehead paper any sum for which this property could be sold within eighteen months; and if it should not be sold within eighteen months, said Eames, at his election, should be entitled to credit on such paper, the appraised cash value of the same to be fixed by three parties,—one chosen by each, and the other chosen by the two selected. But the writing expressly provided that *nothing* therein should give Walker any right of redemption in said property, or in any way impair the indefeasible title of said Eames to the same.

On February 19, 1876, this same land, in pursuance of the decree in the Manning suit, was sold on a *vendi* issued in the law case of *Manning* v. *Walker*, bearing date January 14, 1876, and at this sale Henry F. Eames became the purchaser for the bank, at $15,000, and received a certificate of purchase, which was recorded February 21, 1876. No redemption having been made from this sale, a sheriff's deed was made to Eames May 21, 1877, and placed on record on the next day.

On May 2, 1876, Eames bought the Lee judgment, which was, as above stated, rendered April 8, 1874. This judgment had been assigned to Rend & Co. by Lee, in November, 1874, and Eames acquired this judgment, by assignment, from Rend & Co., and on November 22, 1876, (an *alias fi. fa.* having been sued out the day before,) a bill was filed in the name of Rend & Co., as. complainants, by Helm & Manning, as solicitors. To this bill Rawson and Moffat, (the plaintiffs in the prior judgments against Walker,) and Samuel J. Walker and others, were made defendants. The relief sought in the bill was, in substance, the same as that sought in the Manning bill, and the grounds stated were, in substance, the same, and on February 20, 1877, a decree was rendered like unto the decree in the Manning chancery suit, mentioned above. In pursuance

of this decree the private railroad street, on March 24, 1877, was sold, on execution upon the Lee judgment, to Allan Jordan, (who bought for Eames,) at $5900, and on the 28th of that month received a certificate of purchase, which was that day filed for record, and from this sale no redemption was ever made. Meanwhile, pending this chancery suit in aid of the Lee judgment, the owner of the Rawson judgment against Walker sued out a *pluries* execution on his judgment, had it levied upon this private railroad street and certain other property, and on January 15, 1877, this private railroad street was sold by the sheriff, under that levy, to Vernon, at $2000, who made the purchase for Eames. Vernon received a certificate of purchase, and on January 27, 1877, the same was filed for record. An *alias* or *pluries* execution on the Moffat judgment was issued on January 16, 1878, and levied upon this property, (private railroad street,) and the plaintiff in that judgment paid to the sheriff the amount necessary for a judgment creditor to redeem from the sale to Vernon, (made under the Rawson judgment,) and having so redeemed, he received a certificate of redemption, and the property was again advertised for sale under the Moffat execution, the sale to occur on February 18, 1878. The original bill in this case was filed on February 16, 1878.

On April 1, 1878, this railroad strip was sold on Moffat's execution, to satisfy the redemption money paid to Vernon and the Moffat judgment, and at that sale Moffat, the plaintiff, became the purchaser at $12,035, and received a certificate of sale, and on June 1, 1878, no redemption having been made, the sheriff made a deed conveying the property to Moffat under the Rawson and Moffat judgments and sales, and on June 3, 1878, Moffat and wife conveyed this property to Eames, and these two deeds were filed for record on June 4, 1878.

On June 25, 1878, no redemption having been made from the sale made to Allen Jordan on March 24, 1877, and Jordan having assigned his certificate to Eames, the sheriff made a

deed of this property, under the Lee judgment, to Eames, assignee of Jordan. This deed was recorded July 2, 1878.

On January 11, 1879, Eames sold this railroad strip to the Chicago, Burlington and Quincy Railroad Company at $100,-000, and conveyed the same to that company by deed of that date, and that company paid him for the same in cash. This deed was not recorded.

On January 22, 1879, complainants made Jenkins, assignee in bankruptcy of Samuel J. Walker, a party defendant, by a supplemental bill showing that Walker was adjudged a bankrupt April 26, 1878, and that Jenkins was appointed his assignee, and that all of Walker's estate was conveyed to him, as such, on July 31, 1878.

On January 31, 1880, Jenkins, having answered the bill in this cause, filed his cross-bill against complainants and other defendants, seeking to set aside the claims of Eames and the bank, and of the Chicago, Burlington and Quincy Railroad Company, to the private railroad street, and the liens claimed by complainants, and also seeking to set aside the claims of the bank upon the Lake county land. The relief sought in the original bill was, that the land known as "Private Railroad street" might be adjudged the property of Samuel J. Walker, subject to the priority lien and claim of complainants' several judgments as a valid and *first* lien over and above the rights of each and all of the defendants and all other persons claiming under Walker, and that if Eames, or the Commercial bank, or Henry Walker, holds any part of said property, or any interest or claim therein, the same may be held fraudulent and void as against the liens, claims and rights of complainants, and that the same, and such interest therein, is held in trust for said Samuel J. Walker, subject to the lien of complainants' judgments, and that each of said sales, transfers, judgments and executions may be cancelled and annulled, set aside, and held for naught, and that the redemption from the Moffat judgment may also be annulled

and set aside, and that complainants may be decreed to have a priority of lien and claim over that of Moffat, and that by the further order and decree of this court this land (the private railroad street) may be sold, and the proceeds applied to the payment of complainant's judgments in preference to all other creditors, and for other and further relief.

The decree in the case was rendered October 28, 1882, and by the same, among other things, it was declared and adjudged that the Stewart and Shelby mortgages, and the Price trust deed, had ceased to be liens on this private railroad street, or any part thereof; that the quitclaim deed from Walker and wife to Eames, under date of January 4, 1876; and the paper of the same date, signed by Eames, relating to the application of the proceeds to arise from the sale of the land; and the sheriff's deed of the same property made to Eames, May 21, 1877, under the Manning judgment; and the sheriff's deed of the same property made to Moffat, June 1, 1878, under execution sales made upon the Moffat and Rawson judgments; and the deed from Moffat and wife, of the same property, of June 3, 1878; and the sheriff's deed of the same property to Eames, as assignee of Allen Jordan, the purchaser at the sheriff's sale under the Lee judgment; and the deed of Eames and wife to the Chicago, Burlington and Quincy Railroad Company, of January 11, 1879, conveying the same property; and all writings, deeds and proceedings under which said railroad company claims title to that land, were made and taken by Walker, and Eames, and the Commercial National Bank, with intent to hinder, delay and defraud complainants and other creditors of Walker, and with intent, on the part of Eames, to obtain a fraudulent preference over complainants as judgment creditors of Walker, and that said railroad company acquired title from Eames *pendente lite*, and that so far as relates to said private railroad street, the prayer of the original bill be granted; and that the prayer of the cross-bill of the assignee in bankruptcy, so far as it relates

to the said Lake county land, be denied; and that, subject to the said judgment liens of complainants, the said private railroad street is the property of Jenkins, as assignee in bankruptcy of said Walker; and the railroad company is, by the decree, required to surrender the possession of the property to said Jenkins, as such assignee.

Messrs. DEXTER, HERRICK & ALLEN, and Mr. W. C. GOUDY, for the appellant the Chicago, Burlington and Quincy Railroad Company.

Messrs. SLEEPER & WHITON, for the appellants Eames, Otis and Vernon.

Mr. W. T. BURGESS, for the appellee Jenkins, receiver, etc.

Mr. JOHN WOODBRIDGE, for the judgment creditors, appellees.

Mr. E. S. WILLIAMS, for appellees Otway Watson *et al.*

Mr. JUSTICE DICKEY delivered the opinion of the Court:

The decree in this case concerns two separate tracts of land,—the Lake county land, and the private railroad street, —the one lying in the county of Lake, and the other in the county of Cook. The complainants in the original bill ask for no relief as against the Lake county land, and claim no interest in or lien upon the same. The Lake county land is claimed by the Commercial National Bank, by two titles,— one derived through the purchase at sheriff's sale under the Lake county judgment of the bank against Walker. This judgment was entered January 28, 1874, and on execution sued out, this land was sold, on July 6, 1874, to the bank, in satisfaction of that judgment, and the bank received a certificate of purchase, which was duly recorded. No redemption from this sale was ever made or attempted, either by Walker

14—113 ILL.

or any judgment creditor.  On October 6, 1875, the time for redemption expired, and the bank on that day became entitled to a sheriff's deed, and has ever since been entitled to have such deed.  In equity, the title of the bank is the same as if the sheriff's deed had been made.  Walker was not adjudged a bankrupt until April 26, 1878.  At that time all his right and interest in that land were cut off by that sheriff's sale, and had been so cut off ever since July 6, 1875, when his right of redemption from that sheriff's sale expired.  It is plain the assignee in bankruptcy acquired no right to this land under the bankruptcy proceedings, unless there was some vice or imperfection in this sheriff's sale, rendering the deed inoperative,—and none is shown.  But if this title under the sheriff's sale of July 6, 1874, be regarded as incomplete or inchoate for want of consummation by a sheriff's deed, the bank still has another title through the Tilton trust deed, which was recorded in 1872, and under which that land was sold to Eames, on July 3, 1875, at the price of $86,000, and on that day conveyed to him by the trustee by an absolute deed, which was at once recorded.  By this sale all of Walker's interest in or title to this land passed to Eames, (who bought for the bank,) and unless Walker afterwards acquired title, his assignee in bankruptcy took no title.  No question is made as to the *bona fides* of the debt upon which the Lake county judgment was rendered.  The *bona fides* of the Tilton claim is expressly conceded, and also its priority as a first and valid lien upon the property.

It is charged in the cross-bill of the assignee that both these sales were unreal,—were colorable, only, and were made for the purpose of covering this property for Walker, from other creditors, and that the purpose of these proceedings was to delay, hinder and defraud other creditors of Walker.  The proofs, however, utterly fail to establish this charge.  It is plain, from a consideration of all the proofs, that the sole object of Eames, in all his transactions in relation to this

land, was the promotion and protection of his own rights and interests, and those of his bank.

It is suggested, however, in argument, that the arrangement under which this land was sold to Moorehead constituted that transaction a mortgage to secure to the bank the payment of all debts from Walker to the bank, and saved to Walker a right of redemption. This suggestion, if well founded, could not properly be made availing here, for the assignee in bankruptcy, in his bill, does not seek to redeem, and there is no offer on the part of the assignee to redeem. It would therefore avail nothing, *in this suit*, to hold that Walker still had a right of redemption by reason of the arrangement of July 3, 1875. But even if the pleadings did raise this question ever so plainly, such relief could not properly be granted, because that arrangement, as shown by the proofs, gave to Walker no right of redemption whatever. The arrangement made before the sale on the Tilton deed of trust, as shown by the proofs, was, in substance, that the land, if sold to Eames at that sale, should be sold to Moorehead for a sum equal to the cost of the land to the bank added to the demands of the bank against Walker remaining unsatisfied by the proceedings under which the land was acquired by the bank. By those proceedings the Lake county judgment had been satisfied, which, with interest, amounted then to about $34,831.56; the Tilton claim would be satisfied, say, $54,-240.38; also, the claim bought of the First National Bank, the next lien, $7706.85,—in all, $96,778.79. Add to this the fees of trustee and lawyer, $600, which gives the cost of the land to the bank, $97,378.79. The remaining debts of the bank against Walker (being his liability on the Kuney note, and on the Danville railroad note, and to the Ottawa bank, and on the Manning judgment,) amounted to about $60,521.27. This, added to the cost, aggregated about $157,-900.06. The arrangement then was, that Moorehead should buy the land, unconditionally and absolutely, from the bank,

at the price of $157,900, to be paid in three equal install-
ments,—one in six months, one in twelve months and one in
eighteen months,—with interest on each installment at eight
per cent per annum, payable half yearly, and that the full
payment of all this purchase money by Moorehead should
operate as a satisfaction of the unsettled demands of the bank,
amounting to about $60,521.27, and that a deed should at
once be made by Eames, who held the title for the bank, to
Moorehead, and Moorehead should give to the bank his prom-
issory notes for the price, and secure the payment of these
notes by a deed of trust upon the land, to Keep, as trustee;
and that, as further security for the payment of these notes,
the bank should retain all these demands against Walker,
and might proceed with the collection thereof, and whatever
should be collected therefrom should apply as so much paid
upon the Moorehead notes. And the better to enable Moore-
head to pay, it was to be provided in the deed of trust to
Keep, that upon payment of the first third of the purchase
money and the first installment of interest, one-third of the
land was to be released from the lien of the deed of trust, so
that Moorehead could make sales with a clear title. This
deed of trust was also to contain a power of sale by the
trustee, on default in any of the payments.

This land was bought by Eames at the sale under the
Tilton deed, at $86,000, and the arrangement for the sale to
Moorehead was, on July 3, 1875, carried out by the parties.
There were three parties whose interests were to be affected
by this arrangement: Walker,—who had great faith in the
value of this property, and thought it could be laid off in
blocks and lots, and readily sold for much more than the pur-
chase price,—had induced Moorehead, in the hope of making
a profit thereby, to make the purchase. Eames, who had not
so high an idea of the value of this property, by the arrange-
ment got the personal liability of Moorehead, (who was sup-
posed to be worth at that time about $60,000,) in addition to

the land which he already had, and in addition to the claims which he already had against Walker, as a guaranty that he should realize $157,900, and interest, out of that land, and for the sake of that guaranty he was willing to agree that full payment of the Moorehead notes should operate as a satisfaction of all remaining demands against Walker. Walker was interested in consummating this arrangement, for by his efforts in aiding Moorehead to make sales of the property, so as to bring at least the amount of the purchase money,—and, as he thought, more,—he would, if successful, satisfy over $60,000 of debts, without resorting to any other part of his property. It is thus seen, that instead of these Moorehead notes and trust deed being given as a security for this $60,000 of indebtedness of Walker to the bank, the fact was, that these demands against Walker were retained by Eames as collateral security for the payment of the Moorehead notes. These Moorehead notes were not paid, and in default of payment by Moorehead this land was sold by the trustee, and bought by the bank, at the sum of $100,000, on the 31st day of January, 1877, and the same was on that day conveyed by Keep to the bank.

We see no ground on which Walker could have disturbed this title, by redemption, or otherwise. It was more than a year after the consummation of this title when Walker was adjudged bankrupt. It was six months more before Jenkins succeeded to Walker's rights, and no one pretended to question the title of the bank to this land until January 31, 1880,— three years after it had ripened into an absolute title. Nor is it perceived how any creditor of Walker could be prejudiced by this arrangement. It appropriated no property which they could, in any event, have applied in satisfaction of any of their demands. The arrangement was such that it might benefit such creditors, but it could not possibly harm any one of them. The plan proposed was to create a new fund, without taking any property of Walker's, by which a part of

Walker's debts might be wiped out, and thus render him more able to pay the residue of his debts, of which the judgments of complainants constituted a part. Plainly, neither Walker nor his assignee in bankruptcy, nor any creditor of Walker, could have cause to complain of the arrangement to sell to Moorehead,—nor was it of such a character as to give to any one a right of redemption, except from the Moorehead trust deed, and that right was cut off by the sale to the bank, January 31, 1877. Title of the bank to the Lake county land, under that sale, is plainly paramount to the claim of Jenkins, the assignee.

We come next to the consideration of that part of the decree relating to the land known as "Private Railroad street." This decree was pronounced October 28, 1882. The Chicago, Burlington and Quincy Railroad Company was at that time in possession of that property, claiming title under Samuel J. Walker, through a deed made by Eames and wife to that corporation, on January 11, 1879. The original complainants claim to appropriate the property in satisfaction of judgments which they have against Walker, as the property of Walker, and the assignee, Jenkins, claims the property as part of the estate of Samuel J. Walker. All parties claim under Walker. The railroad company claims that Walker was divested of all claim to this property in several different ways:—

*First*—By the quitclaim deed of Walker and wife, made January 4, 1876, conveying this property to H. F. Eames, which was recorded February 16, 1876. This was prior to Walker's bankruptcy, but subsequent to complainants' judgment liens.

*Second*—By sheriff's deed to Eames, made May 21, 1877, under the Manning judgment, rendered January 20, 1875, and on which execution issued within the year, and on which a *vendi* was afterwards issued, and, on due notice, the sale was made to Eames, February 19, 1876. This was subsequent to complainants' liens, and prior to Walker's bankruptcy.

*Third*—By a sheriff's deed, made June 1, 1878, to Moffat, in pursuance of a sale upon the Moffat judgment, which was a lien prior to complainants' liens, nourished by a redemption by Moffat from a former sale under the Rawson judgment, which was the first judgment lien. This title passed, by deed, from Moffat to Eames, on June 3, 1878, which was duly recorded.

*Fourth*—By sheriff's deed of June 25, 1878, to Eames, as assignee of Allen Jordan, who bought the property at a sheriff's sale made March 24, 1877, under a judgment and execution against Walker and Young, in favor of O. H. Lee, which judgment was a lien prior to complainants' judgments.

By the decree in this case, made October 28, 1882, each and all these judgments, executions, sales and sheriff's deeds, and Walker's deed to Eames, are set aside, and this property adjudged to be that of the assignee in bankruptcy of Walker, subject to the liens of complainants for the amounts due on their judgments, aggregating about $109,422. It is plain that if any one of these titles in Eames can be sustained, the assignee in bankruptcy has no standing enabling him to claim this property, and it is equally plain that if the title under the Rawson and Moffat judgments, or the title under the Lee judgment, can be sustained, neither the original complainants nor the assignee in bankruptcy have, in equity, any right to such a decree, and that such title is superior to the rights, claims, liens and equities of both the original complainants and those of the assignee in bankruptcy.

Let us first consider the title of Eames to this tract of land, under the Lee judgment. This judgment was rendered in the Superior Court of Cook county, in favor of Lee, and against Walker and Young, on April 8, 1874, for the sum of $5668.12. Execution was at once sued out, directed to the sheriff of Cook county, and returned by the sheriff, October 25, 1874, "no part satisfied." An *alias* execution was sued out on November 21, 1876, and the same was levied, on the same day, on

the property called "Private Railroad street," and having been duly advertised, was sold, on March 24, 1877, by the sheriff, for the sum of $5900, to Allen Jordan, to whom the sheriff issued a certificate of purchase, dated March 28, 1876, which was on that day duly recorded, and on June 25, 1878, the sheriff conveyed this property to H. F. Eames, to whom this certificate of purchase had been assigned by Allen Jordan, the purchaser. This judgment was prior, in time, to all the judgments owned by the original complainants. There were two other judgments against Walker upon the records of the Superior Court of Cook county which were prior in date to this Lee judgment,—one in favor of one Rawson, for $5237, rendered February 25, 1874, and one in favor of Moffat, for about $7718, rendered March 14, 1874,—and on each of these judgments executions had been sued out, and returned unsatisfied, within that year. This Lee judgment had been assigned by the plaintiff, some time in November, 1874, to Rend & Co., and the assignment was filed in the case, and about May 2, 1876, Eames bought the same from Rend & Co., and after this an *alias* execution was sued out, in November, 1876, and levied on this property. Eames, through Helm & Manning, as solicitors, caused a bill in chancery to be filed in the Superior Court of Cook county, in the name of Rend & Co., as complainants, and against S. J. Walker, Rawson, Moffat, one Prentiss, Henry Walker, and others, as defendants. And such proceedings were afterwards had that Samuel J. Walker, Henry Walker, and the owners of all older judgments, by service of process, were brought into court, and on February 20, 1877, a decree was entered declaring the property to be that of Samuel J. Walker, and subject to the lien of this Lee judgment, and directing the sale of the property and the application of the proceeds to the payment of *that* judgment, and declaring and adjudging this judgment to be a prior and first lien upon the property, as against the owners of the older judgments. And it was in pursuance

of this decree that the sale above mentioned was made, on March 24, 1877, by virtue of the *alias* execution issued upon that Lee judgment, and at which Allen Jordan became the purchaser, as above stated. These proceedings seem to be regular, and whether this decree was erroneous or not, it became and was binding upon the parties thereto, and hence the title derived under this Lee judgment is not subordinate to the judgment liens of the Rawson and of the Moffat judgments.

The principal allegation of complainants, and of the assignee of Walker, in this case, and on which they ask that this Lee judgment, and the sale under it, shall be set aside, is, that the Lee judgment had been fully paid by Joseph E. Young long before it was assigned to Eames. This allegation is not sustained by any proof whatever, but, on the contrary, it is expressly proven that it was and continued a valid judgment, and that it was assigned to Rend & Co. for a valuable consideration, and assigned by Rend & Co. to Eames for its face value. It is also alleged, in very general terms, in complainant's bill in this case, that the institution of the chancery suit in aid of the execution at law, upon this Lee judgment, was in pursuance of an unlawful and fraudulent plan and scheme entered into between Walker and Eames to obtain title to the said railroad strip, which is referred to as mentioned in an earlier part of the bill, and in examining the antecedent parts of the bill, to ascertain what that unlawful and fraudulent scheme is alleged to have been, we find it alleged that "it was agreed between the said Eames and the said Walker that the said Walker should procure, purchase and obtain divers and sundry claims, in the nature of older judgments against him, the said Walker, and a certain mortgage," (being one given by Walker to one Stewart,) and "that by and through sales on such judgments and mortgage so to be obtained, as aforesaid, the said title," (that is, the title to this private railroad street,) "could and would be obtained by the said Eames," and that

"it was some time . * * * about the 1st of January, 1876, that the aforementioned fraudulent and collusive plan and understanding between the said Eames and Walker was entered into, whereby it was attempted and undertaken by and between the said Eames and the said Walker, by and through the purchase and use of *paid up* and *satisfied* and *fraudulent* judgments," and that at that time it was agreed and arranged that when the title to the said railroad could be obtained by any of the means above referred to, the value of the same, as ascertained by sale or appraisal thereof, should be applied in payment and satisfaction of the aforesaid notes of the said Franklin C. Moorehead,— which are charged to be illegal, corrupt and void. The proofs show that this chancery suit in aid of the Lee judgment was not instituted *in pursuance* of a plan and scheme to obtain title to this railroad street, by *having Walker* purchase and obtain claims in the nature of older judgments against himself, or by having him buy the Stewart mortgage, or by the purchase and use, *by any one*, of *paid up* and satisfied and fraudulent judgments, but it was instituted to aid in the satisfaction of a *valid* judgment against Walker, which had *not been paid* by any one, and which had not been in any way satisfied, and which had been assigned by Lee to Rend & Co.; and by the latter to Eames. The grounds of attack by complainants upon this title under the Lee judgment, are not, therefore, sustained by the proofs, even were it assumed that such a contract or scheme as that charged in the bill had actually been made. The only vice in the scheme as alleged in the bill, rests in *that part* of it by which it is charged that Walker was to purchase the judgments *with his own means*, which, it is said, would have been a satisfaction of such judgment, and that in such case, proceedings under it would have been upon a satisfied judgment. Even if it be true that Eames had made a contract with Walker that he (Walker) should procure this judgment in that way, for Eames' use, that fact would not disqualify Eames,

or render him incapable of purchasing the judgment with his own money, nor would it impair the validity of the judgment if Walker's means were not in fact used in procuring it, or the validity of proceedings under such judgment, so long as the judgment was valid, and owned by Lee or his assignee, even if bought by Eames with his own money,—unless, indeed, the whole was a scheme to cover the property from Walker's creditors, and for his use, beyond the reach of such creditors. No proof in the case charges Eames or his bank, or any owner of this Lee judgment, with any such actual fraud, or with any intention to defraud Walker's creditors, or to cover the property for Walker, against any of his creditors.

The assignee in bankruptcy, in his cross-bill, also attacks this title under the Lee judgment by the allegation that the judgment was paid in full by Young, (who was a defendant in the judgment with Walker,) but that the judgment was allowed to remain of record unsatisfied, and that Eames was advised by Walker of the existence of this judgment, and that for the purpose of carrying out a fraudulent combination and conspiracy before that time entered into between Eames and Walker to cover up and hold Walker's property for his use, and to protect it from his other creditors, Eames, without paying anything for the judgment, but pretending to be the owner thereof, procured the bill in chancery to be filed to obtain priority over older judgments, and obtained the decree, as above stated; and that pursuant to that decree this land was sold for about $6000, and a certificate of purchase issued, which was held by the bank until the sheriff's deed was made; and that, in fact, at said sale no money was paid, and the "*whole thing was a sham*" and *device* to aid Walker in covering up and concealing his property, and keeping the same away from his creditors. The proofs utterly fail to sustain the allegation that the judgment had been paid by Young, or any one else, or that the sale was a sham, and the proofs utterly fail to show any purpose on the part of Eames or his bank, or

any owner of this judgment, to aid Walker in covering up or concealing his property, and keeping the same away from his creditors.    The allegations of actual fraudulent intent on the part of Eames, find no support in the proofs.    The assignee in bankruptcy states that on January 4, 1876, when Walker and wife made to Eames the quitclaim deed conveying to him all of Walker's interest in this land, Eames gave to Walker a writing, which is set out in full in his cross-bill, which, in argument, he insists renders the title of Eames vicious.    The only charge in the cross-bill of the assignee in bankruptcy, in relation to *this contract*, is, that it reduced to writing, in part, the understanding and agreement between Walker and Eames, made in pursuance of a fraudulent combination and conspiracy of Eames and Walker touching the acquisition of title to the Lake county lands and to this private railroad street, for the benefit of Walker, as charged in the bill,—which charge was, that the purpose was to cover the property against Walker's creditors, and secretly for his use.    We have already said the proofs utterly fail to charge Eames with any purpose of this kind, or with actual fraud, as charged in the bill.

It is, however, strenuously insisted, in argument, that this contract, however honestly made, was, from its very nature, a fraud upon Walker's creditors.    To comprehend the meaning and get the true construction of this transaction we must keep in mind not only the words of the contract, but the facts surrounding the parties at the time, and which must have been in their contemplation.    It must be remembered that by the arrangement made between Eames and Walker, and Moorehead, at the sale of the Lake county land to Moorehead, on July 3, 1875, for $157,900, and interest, it was agreed that the payment of the Moorehead notes should operate as a satisfaction of all of Walker's remaining indebtedness to the bank,—which, as we have seen, amounted to about $60,000, —and that all moneys realized in the meantime by Eames, for his bank, from collections upon these debts of Walker to

the bank, should operate as credits on Moorehead's paper. Walker, although without money, was the owner of a vast amount of property, still heavily incumbered, and still hoped to be able to make his property pay all his debts and leave to him a surplus, and so he had a deep interest in bringing about the full payment of the Moorehead notes, so that the sum of some $60,000 of his remaining indebtedness should thereby be cancelled. He had a lawful right, for this purpose, to apply any property or property interest under his control to the accomplishment of this laudable end. The first installment on this Moorehead paper, amounting to about $59,000, principal and interest, had fallen due January 3, 1876, and had not been paid by Moorehead, and Eames contemplated proceedings to foreclose the trust deed upon the Lake county land. Walker hoped that if these proceedings could be delayed, Moorehead would be able to pay his notes, and that he (Walker) could, by arrangements for private sales of parts of the Lake county land, aid Moorehead to make the necessary payments. Eames wanted all the additional security he could get, to render more probable the payment of the Moorehead notes. All these purposes were lawful. To that end, Eames had already caused the execution on the Manning judgment to be levied upon this private railroad street, and the bill of Manning, against Walker and others, was pending, under which (whether wisely or not) priority was sought for this judgment over all older judgments, with the view of acquiring satisfaction of that judgment out of this railroad street, and with the expectation that a complete title to that property might be obtained. Walker, as one of the defendants, had been delaying the proceedings under the Manning bill, and Eames, by this time, had been advised that nothing could be attained by that bill as against older judgments, the owners of which had not been made parties. He knew there were prior liens of record, in the shape of mortgages and trust deeds, and in the shape of prior judgments, and that the Rawson

judgment was the oldest, and he believed that a title under that judgment would be the safest, and would be complete, save as to dower of Walker's wife. Under these circumstances the transaction of January 4, 1876, was enacted. In these lights let us examine it, and see what was its true character.

Walker conveyed his interest in the land, and his wife released her dower. This interest of Walker was merely his right of redemption from prior mortgages, and even that right of redemption was subject to the prior lien of judgments of record, aggregating a sum greatly in excess of the value of the land if entirely free from incumbrance. This conveyance could not be a fraud against creditors with prior liens, for it was subject to such liens, and could not impair them. It was a conveyance Walker had a lawful and honest right to make as against debtors without liens, if made for an honest purpose, and upon valuable consideration. The debts which Eames controlled were valid and honest debts. Walker had a right lawfully to pay them with any property he held, or with his own money, if he had any, in preference to any other creditors having no liens upon such property or money. His doing so would not be dishonest. It is not essential to the honesty of a debtor, though overwhelmed with debt, that he shall be impartial as between his creditors, and not prefer one over another. What, then, is the true meaning of this transaction? Walker and wife convey his interest in this land, with the wife's dower right, for the consideration that its value shall be credited upon these Moorehead notes, with a view to aid in their ultimate payment, by which payment, when accomplished, Walker's debts to this bank should be cancelled. The conveyance was absolute and indefeasible, but the amount of the credit remained to be ascertained by future contingencies, as stated in the paper; but in any event, the real value acquired by that deed was to be credited upon the Moorehead notes. This was the main contract. Ancillary to this main contract are other provisions

in this contract.  By these, Walker undertook to do all he could to perfect the title to this land in Eames, by bringing about judicial sales, or by bringing about the foreclosure of mortgages or deeds of trust, or by procuring the release of this land from prior incumbrances, whether by mortgage, trust deed or judgments, or in any other mode.  ·It was to his interest to do this without any contract, for it would swell the credit to be made on the Moorehead notes.  He particularly undertook that within ninety days (that is, by April 3, 1876,) the Rawson judgment should be secured, by transfer or otherwise, to Eames; and that within six months (that is, by July 4, 1876,) this land should be cleared from the Stewart mortgage, by sale, foreclosure or release; and that within one year this land should be freed from the lien of the Price and Shelby mortgages.  Eames agreed that if Walker should comply with these undertakings, he would give stay or delay on the Moorehead paper; but if Walker failed to accomplish these things, Eames was at liberty to proceed under the Moorehead deed of trust to Keep.

As already suggested, there was nothing unlawful or necessarily fraudulent in the making of the deed to Eames, and in his agreeing to credit its value on the Moorehead paper. It is plain no law forbade Walker from procuring a release of this property from the Stewart, Price and Shelby mortgages, by payment, or by any other honest means, or from inducing the holders to foreclose upon the property subject thereto. If there be any vice in any of Walker's undertakings in that paper, it is that provision which relates to the Rawson judgment.  By April 3, 1876, he undertook or promised that the Rawson judgment should be *secured*, by transfer or otherwise, to Eames.  It is assumed by appellees that this means that Walker, with his own money, would pay this judgment, and instead of having satisfaction entered he would cause it to be transferred to Eames as a valid judgment, so that Eames, through a sale on that judgment, though a nullity, could·

acquire an apparent paramount title to this property.   Do the words, by necessary implication, convey that meaning?   May they not reasonably be construed to mean that Walker should, by some lawful means other than paying off the judgment, induce Rawson to transfer the same to Eames, or otherwise give Eames the control of proceedings under that judgment, so that the land in question should be sold under that judgment, and thereby Rawson should get his money in satisfaction of the judgment, and Eames, as a purchaser at the sale, might get a paramount title to the land?   The nature of Walker's title and right to this railroad street was at least peculiar, and it may be that Walker knew that Rawson did not wish to purchase the same on his judgment, and that Walker thought that by letting Rawson know that Eames desired to perfect a title thereto, and would bid the amount of the judgment if he could have it transferred to him, he could induce Rawson to transfer the judgment to Eames, and wait for his money until a sale of the land under the judgment.   If this be the true meaning of the words, it is not perceived that there is anything unlawful or fraudulent in the provision as to the Rawson judgment.

Be this as it may, as it turned out, the title to this property, under the Lee judgment, does not depend upon that contract, and is entirely independent of it.   Walker failed entirely to perform this undertaking in that contract, and came to Eames and notified him that he was unable to accomplish any of his undertakings in this regard, and Eames then undertook, himself, to procure title to this land under these prior judgments. If we assume that the undertaking on the part of Walker, under that contract in relation to the Rawson judgment, was unlawful and fraudulent, does it follow that these parties could not lawfully abandon it?   And having abandoned that provision, was Eames, after its abandonment, by the mere fact that he had made such a contract, incapacitated by law from afterwards adopting lawful means to acquire older judgments,

and through them to acquire title to this land, if he desired so to do? About a month after the expiration of the ninety days in which Walker was to secure to Eames the Rawson judgment, and after Walker had avowed his incapacity to do any of the things which were to secure delay in enforcing the collection of the Moorehead notes, Eames, on May 2, 1876, bought of Rend & Co. the Lee judgment, and proceeded at his own expense to procure title to this land under that judgment, and did so. · It is not seen how the contract of January 4, 1876, can in any way affect the validity of the proceedings which were in fact had under the Lee judgment. That title being valid, and resting on a lien prior to the liens of complainants, is paramount to the claims and liens of appellees, and it was error in the circuit court to set the same aside.

It is insisted, however, that Eames did not abandon the provisions of the contract of January 4, 1876, and it is asked, why did he not then reconvey the property to Walker? The answer is plain. The purpose and consideration for the conveyance to Eames were not that Walker should perform his promise, but that *the value* of what was conveyed should, when ascertained, *be applied* as a credit on the Moorehead notes. This application was not to depend upon Walker fulfilling his undertakings in strengthening the title. The only thing that was to depend upon his successful performance of the executory part of the contract, was the undertaking of Eames to forbear in enforcing the payment of the Moorehead notes. By that contract Eames was to retain what was conveyed to him, whether Walker performed or not; and whether he performed or not, the value of that conveyance to Eames, when ascertained, was to be credited upon the Moorehead notes. It was not ascertained, in fact, until the sale to the railroad company was made, in 1879. Walker was, in any event, to have eighteen months to find a satisfactory purchaser, and if a purchaser at a price satisfactory to Walker could be found in that time, that was to fix the amount

of the credit. If no such purchaser was found in eighteen months, Eames was to have his election to keep the property without sale, and credit its value, to be fixed by appraisers; or he might elect to sell for the best price he could get, and that price was to fix the amount of the credit, which credit, of course, would be the excess of that price over the money judiciously spent by Eames in clearing the title. This would give the net value of the conveyance by Walker to Eames, made January 4, 1876.

It is also contended that the fact that Walker, after this provision of that contract is claimed to have been abandoned, did, in fact, coöperate with Eames in his efforts to perfect title in Eames, although not by the purchase of any of the judgments with his (Walker's) money, shows that this part of the contract was not abandoned. It is not perceived that any such inference should be drawn. Walker had the lawful right, by his advice to and negotiations for Eames, to aid him in accomplishing this end, if the end was one Eames had the lawful right to seek. Besides, Walker, aside from his promise to procure the transfer to Eames of the Rawson judgment, had an interest prompting him, very properly, to desire success to Eames, so that by the payment of the Moorehead notes his $60,000 indebtedness would be cancelled.

It is, however, strenuously insisted in argument, that this contract of January 4, 1876, rendered the deed of that date a mere mortgage, and that the assignee therefore has a right to redeem this railroad strip from the same. He does not ask, in his bill, to redeem, and unless the law is such that the parties were incapable of making the conveyance absolute, this position is not tenable. By the terms of that agreement it was clearly the intention to give an absolute title, from which there was to be no redemption. The intention of the parties clearly was that the title conveyed should, in any and every event, remain in Eames and his heirs and assigns forever, and that the value of the matter conveyed was to be

credited on the Moorehead notes, and that value should be the net excess of the proceeds of the sale of the property over and above all cost to Eames in perfecting the title. This net value is shown, by the proofs, to have been about $67,000. Had this been a bill seeking to have the value of this property, as shown by its sale, credited upon the Moorehead notes, and thus to show that the Moorehead notes were fully paid, and hence the claims of the bank against Walker satisfied, another and different question would have been presented. But no such relief was sought in the bill, and plainly no such relief could have been granted on the facts. The balance due upon the Moorehead notes at the time of the sale to the railroad company, by the accumulation of interest,— after deducting the $100,000 credited for the sale under the Moorehead deed of trust,—was about $89,874, while the value of the estate conveyed by the deed of Walker of January 4, 1876, to Eames, as ascertained by the sale by Eames to the railroad company, was only about $67,000, which would still leave a balance due on the Moorehead notes of about $22,874.

We find nothing in the contract of January 4, 1876, or in any other matter in this record, to impair the validity of the Lee judgment, or the title to this railroad street, acquired through the sale thereof upon the *alias* execution founded thereon. As against the complainants, and as against the assignee in bankruptcy, that title is paramount.

Under the view presented here, it is unnecessary to discuss in detail the merits of the title acquired by Eames under the sheriff's deed, founded upon the sale under the Moffat judgment. It may not be amiss, however, to say we find no good cause to set that aside.

Some technical objections are urged against the title under the Rawson and Moffat judgments, relating to the mode of advertising, and, perhaps, in other respects. Such technicalities can not prevail in a court of equity, where no injury

seems to have been done to the rights of any one, and where the proceedings were had in good faith.

The judgment of the Appellate Court in these two appeals, affirming the decree of the circuit court, is therefore reversed, and the causes remanded to that court, with directions to reverse the decree of the circuit court and remand the causes to the circuit court, with directions to dismiss the cross-bill of Jenkins, assignee, etc., and also the bill of the original complainants, for want of equity.

*Judgment reversed.*

Mr. JUSTICE SHELDON does not concur in the view that the deed and agreement of January 4, 1876, were not fraudulent and void as to creditors.

SCHOLFIELD, Ch. J., and MULKEY, J., dissenting.